UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KIM MARIE RICHARDSON,

        Plaintiff,                        CIVIL ACTION NO. 10-15168

     v.                              DISTRICT JUDGE ROBERT H. CLELAND

COMMISSIONER OF             MAGISTRATE JUDGE MARK A. RANDON
SOCIAL SECURITY,

        Defendant.
_____/

**REPORT AND RECOMMENDATION ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT [DKT. NOS. 7, 10]**

Plaintiff Kim Marie Richardson brings this action pursuant to 42 U.S.C. § 405(g) challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Social Security Income ("SSI") under the Social Security Act. Both parties filed summary judgment motions (Dkt. Nos. 7, 10), which are presently before this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) (Dkt. No. 3).

**I. RECOMMENDATION**

In light of the entire record in this case, I find that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, it is **RECOMMENDED** that Plaintiff's motion for summary judgment be **DENIED**, Defendant's motion for summary judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

## II. REPORT

### A. Procedural History

On September 17, 2007, Plaintiff filed applications for DIB and SSI asserting that she became unable to work on July 27, 2007. (Tr. 102-108.) The Commissioner initially denied Plaintiff's disability application on January 1, 2008. (Tr. 49-56.) Plaintiff then filed a request for a hearing, and on December 30, 2009, she appeared with counsel before Administrative Law Judge ("ALJ") Cynthia Bretthauer, who considered the case *de novo*. (Tr. 13-37.) In a December 10, 2009 decision, the ALJ found that Plaintiff was not disabled. (Tr. 25-46.) The ALJ's decision became the final decision of the Commissioner on October 25, 2010 when the Appeals Council denied Plaintiff's request for review. (Tr. 1.) Plaintiff filed this suit appealing the Commissioner's decision on December 29, 2010. (Dkt. 1.)

### B. Background

Plaintiff was 35 years old on her alleged disability onset date. (Tr. 102.) She has a high-school education and an Associates Degree as a Medical Administrative Assistant. (Tr. 14, 30.) She worked part-time as a teacher's aide/tutor until July 27, 2007. (Tr. 14, 34.) The record contains two reasons for her leaving her position as a teacher's aide/tutor. (Tr. 14, 34, 142.) At the hearing Plaintiff testified that she stopped working due to her pregnancy, which exacerbated pre-existing knee pain. (Tr. 14, 34.) In a Disability Report completed by Plaintiff on October 16, 2007, she wrote that she stopped working because "the job funds ran out." (Tr. 142.) Plaintiff gave birth via C-Section on February 15, 2008. (Tr. 239, 271.) Plaintiff returned to work full-time in a cafeteria doing food preparation and serving on August 26, 2008. (Tr. 30-31.) Plaintiff's claim is for a

closed, thirteen-month period of benefits from July 27, 2007 through August 26, 2008. (Dkt. 7, Pl.'s Mot. Summ. J. at 5.)

### 1. The Hearing Before the ALJ

#### (a) Plaintiff's Testimony

At the December 2009 hearing before the ALJ, Plaintiff testified about her Carpal Tunnel Syndrome ("CTS"), pregnancy, and knee issues. (Tr. 25-46.) Plaintiff testified that she left her job as a teacher's aide/tutor because her employer could not abide by her doctor's restrictions – limited walking and standing – during her pregnancy. (Tr. 31.) Plaintiff's doctors ultimately recommended surgery for her knee pain, which they diagnosed as resulting from a tear of the medial meniscus, but she could not have the surgery during her pregnancy. (Tr. 34-35, 233.) Plaintiff admitted that her knee pain improved after she gave birth on February 15, 2008. (Tr. 34.) As of December 30, 2009, Plaintiff still had not had surgery. (Tr. 35.) Plaintiff also previously wore wrist splits for CTS, but testified that she really did not have pain in her wrists during her pregnancy. (Tr. 35-37.) Her previous CTS surgery in October of 2006 "relieved that." (Tr. 37.)

Plaintiff testified that she had sharp pains in her knee during pregnancy. (Tr. 36.) She also testified that she could not straighten or bend her knee for "long periods of time," and she could not stand up. (*Id*.) Plaintiff testified that her doctors wanted her to lose weight, but when she got pregnant, the only thing she could do was "change [her] eating habits" because they did not want her to initiate exercise. (Tr. 38.) She testified that she walked with a cane during her pregnancy, but could get from her apartment to her car. (Tr. 38.) Plaintiff also testified that she could only stand or sit for two or three minutes at a time so she mainly laid down. (Tr. 39.) Her family helped her

care for her other two children – ages seven and thirteen at the time. (Tr. 30, 39.) Her typical routine consisted of the following:

> I would get up, take my kids to school, come back home and lay down. And then I would get up, go pick my kids up from school, come back home and lay down. I may, I would get up and try to cook and my mom would come over. She would come over every day and if, if I couldn't stand up at the stove to cook then she would go over and she would do whatever it is. And I, we alternated. With the housework, she helped out with the housework and my [oldest daughter], she would help out also. I would do, you know, the light stuff. . . . if I had to vacuum I would vacuum for a couple of minutes and then I would have to sit down. As far as cleaning like the bathrooms and everything I couldn't do that because I couldn't stand up to clean it.

(Tr. 40.)

She would also try to do the laundry. (*Id*.) Plaintiff testified that she was able to bathe and dress herself. (Tr. 41.) She did the grocery shopping with the help of a "motorized cart." (*Id*.) She also testified that her older daughter helped out with the younger daughter. (*Id*.)

*(b) Vocational Expert's Testimony*

Vocational Expert ("VE") James Breen also testified at Plaintiff's hearing before the ALJ. (Tr. 42.) The ALJ asked the VE questions based on the following hypothetical individual:

> Presume on the basis of the record an individual who is 37 years old, has work experience and education as the claimant and has the following exertional limitations: can sit for six to eight hours out of the day, stand and walk about six hours out of a day; assuming someone who could lift and carry frequently up to 25 pounds, occasionally up to 50 pounds; further assuming someone who could only occasionally stoop, crawl, climb, crouch or kneel.

(Tr. 43.)

The VE testified that such an individual could perform Plaintiff's past work as a teacher's aide/tutor. (*Id*.) The VE testified that the same would be true if the individual were limited to light

work. (*Id.*) The VE also stated that the individual could perform other jobs such as cashier, fast food worker, and host/greeter. (Tr. 44.) The VE testified that there were 120,000, 8,000 and 3,500 of these jobs available in Michigan, respectively. (*Id.*) These jobs were still available even if the hypothetical individual could not do constant or repetitive grasping with the right hand. (*Id.*)

The VE also testified that the hypothetical individual could perform the following other jobs at the sedentary level: charge account clerk, information clerk, and order clerk. (Tr. 44.) The VE testified that there were 4,500, 35,000 and 500 of these jobs available in Michigan respectively. (*Id.*) On questioning by Plaintiff's attorney, the VE stated that the need to lie down at unpredicted times during the work day would preclude work. (Tr. 45.)

   2. *Medical Evidence*

On January 18, 2007, Plaintiff saw Dr. Jing Xiao of the Genesys Regional Medical Center regarding her weight. (Tr. 208-09.) At that time, she was 5'5" tall and 332 pounds. (Tr. 206, 208.) Dr. Xiao referred her to the Lifestyle Change Clinic. (Tr. 209.) Dr. Xiao also told her to watch her calories, and exercise for fifteen minutes a day. (Tr. 208-09.)

It appears as if Plaintiff's knee pain first surfaced on or about April 10, 2007, when Plaintiff saw Dr. Jane Klaes of Genesys Regional Medical Center. (Tr. 210.) At that time, Dr. Klaes ordered an x-ray to look for osteochondritis dissecans[1] or osteochondral defect.[2] (*Id.*) The x-ray indicated

---

[1] The "inflamation of both bone and cartilage . . . . resulting in the splitting of pieces of cartilage into the joint." *Dorlands Illustrated Medical Dictionary* 1366 (31st ed.)

[2] A defect "pertaining to or composed of bone and cartilage; pertaining to a bone and its articular cartilage." *Dorlands* at 1336.

an "unfused fragment of [the] anterio tibial . . . . likely residual of Osgood-Schlatter's disease."[3] (Tr. 228.)

At some point between these x-rays and Plaintiff's next appointment at Genesys Regional Medical Center, Plaintiff discovered that she was pregnant. (Tr. 207.)

On July 16, 2007, Plaintiff saw Dr. Madhavi Madugula of the Genesys Regional Medical Center regarding her knee pain. (Tr. 207.) Dr. Madugula noted that x-rays showed "likely Osgood-Schlatter's disease." (*Id*.) Dr. Madugula gave Plaintiff Tylenol #3 for the pain and told her to apply ice. (*Id*.) She also counseled Plaintiff on weight loss. (*Id*.) Dr. Madugula told Plaintiff not to take Motrin during her pregnancy. (*Id*.)

On July 30, 2007, Plaintiff had an ultrasound due to her hypertension and exposure to medication that indicated that she was approximately 15 weeks pregnant with a due date around February 20, 2008. (Tr. 222.) Plaintiff continued to have multiple ultra-sounds throughout her pregnancy due to hypertension and exposure to medication. (Tr. 222, 225, 260-71.)

Plaintiff saw Dr. Marissa Walkerdine-Rogers of the Genesys Regional Medical Center on September 7, 2007 for continuing knee pain. (Tr. 203.) Plaintiff was crying during the exam and could not tolerate the assessment. (*Id*.) Dr. Walkerdine-Rogers questioned whether there was "some dramatization of this pain." (*Id*.) Dr. Walkerdine-Rogers stated that the right knee pain was "chronic, likely worsened due to increased weight and increased weight of pregnancy." (*Id*.) She

---

[3]Osgood-Schlatter disease is a disease that causes "a painful lump below the knee cap in children and adolescents experiencing growth spurts during puberty." Mayo Clinic Staff, *Osgood Schlatter disease* (March 19, 201). www.mayoclinic.com/health/osgood-schlatter-disease/DS00392

told Plaintiff that "since she [was] pregnant, there [was] not much that [they could] do at this time except for Physical Therapy and get her in to see Ortho for possible surgery post-pregnancy." (*Id*.)

Plaintiff saw Dr. Walkerdine-Rogers regarding her knee pain again on September 14, 2007. (Tr. 202.)  At that time, Dr. Walkerdine-Rogers indicated that Plaintiff needed "a restricted work plan" that did not require "standing or walking for any length of time." (Tr. 202.)  Dr. Walkerdine-Rogers indicated that "[i]f this is not available, she will have to be off work until January when she can see the orthopedic surgeon." (Tr. 202.)

Plaintiff saw Dr. Walkerdine-Rogers again on October 23, 2007. (Tr. 200.)  She claimed that her pain was a "10 out of 10, even while sitting." (*Id*.)  Dr. Walkerdine-Rogers restricted her to a "sitting job and no walking and standing." (*Id*.)  In response, the Plaintiff "was very tearful and said that nobody is understanding her pain." (*Id*.)

Plaintiff saw Dr. Walkerdine-Rogers again on November 9, 2007 regarding her knee pain. (Tr. 199.)  She requested more Tylenol #3 and something to help her sleep. (*Id*.)  Dr. Walkerdine-Rogers told Plaintiff that she did not even want her to take Tylenol #3 for the baby's sake. (*Id*.)  Plaintiff stated that she would "use them sparingly." (*Id*.)  Dr. Walkerdine-Rogers told her to use Benadryl to sleep. (*Id*.)

Plaintiff saw Dr. Walkerdine-Rogers again on November 27, 2007 regarding her knee pain. (Tr. 197.)   Plaintiff claimed she had dropped her previous Tylenol #3 prescription in the rain, and needed the prescription refilled. (*Id*.)  Dr. Walkerdine-Rogers refilled the prescription. (*Id*.)

Plaintiff saw Dr. Walkerdine-Rogers again on December 4, 2007. (Tr. 195.)  She had recently been to the emergency room due to her pain. (*Id*.)  Dr. Walkerdine-Rogers noted that Plaintiff felt that she was in so much pain that she was unable to work, and requested that the doctor

complete disability paperwork. (*Id*.) Doctor Walkerdine-Rogers did so and recommended an MRI postpartum. (*Id*.)

Plaintiff saw Dr. Walkerdine-Rogers again on January 3, 2008. (Tr. 241-42.) Although she complained of knee and shoulder pain, she was "laughing and joking around" with Dr. Walkerdine-Rogers. (Tr. 241-42.) She requested that Dr. Walkerdine-Rogers complete "disability paperwork . . . for some sort of subsidized housing secondary to the chronic pain." (Tr. 242.) Dr. Walkerdine-Rogers wrote in her medical report: "At this point I will send her to Dr. Kovan and we will have him fill out her disability paperwork if he feels that it is needed and to make sure she is having legitimate pain." (*Id*.)

On January 4, 2008, Jenny Farely performed a case analysis for the state Disability Determination Service regarding Plaintiff's alleged disabilities. (Tr. 230.) She indicated that Plaintiff's condition was "not expected to persist for 12 months." (*Id*.)

Plaintiff saw Dr. Kovan on January 9, 2008. (Tr. 272.) He indicated that her x-rays were consistent with "Osgood-Schlatter disease." (*Id*.) He also noted that she had a "fairly normal gait pattern" and could "get on the examination table independently." (*Id*.) Dr. Kovan recommended ice and "relative rest." (Tr. 273.) There is nothing in the record indicating that he completed any disability paperwork. (Tr. 272-73.)

Plaintiff gave birth via C-Section on February 15, 2008. (Tr. 239, 271.)

Plaintiff returned to Dr. Walkerdine-Rogers on February 26, 2008 – 11 days postpartum – and indicated that "the knee pain is doing much better now since delivering." (Tr. 239.) Plaintiff

returned to Dr. Walkerdine-Rogers on March 18, 2008 regarding her right hand[4] and right knee pain. (Tr. 237.) Dr. Walkerdine-Rogers noted that her knee pain "could be worsened secondary to [her] morbid obesity." (*Id*.) Dr. Walkerdine referred her to orthopedics. (*Id*.)

Plaintiff had an MRI of her right knee on May 6, 2008. (Tr. 233.) It showed a "[s]mall posterior popliteal cyst" and a "[c]omplex tear of the posterior horn of the medial meniscus." (*Id*.) There are no further medical records in the transcript.

### C. Framework for Disability Determinations

Under the Social Security Act (the "Act") Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) is available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the:

> [I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

---

[4]On October 13, 2006, Plaintiff had CTS surgery on her right hand. (Tr. 192.) During her March 18, 2008 appointment she wore "cockup wrist splits." (Tr. 237.) Plaintiff testified at the hearing that she did not really have pain in her wrists during her pregnancy. (Tr. 37.) She testified that the October 2006 surgery had "relieved that." (*Id*.)

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D. The Administrative Law Judge's Findings

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity between July 27, 2007 and August 26, 2008, the period when Plaintiff claimed to be disabled. (Tr. 11.) At step two, the ALJ found that Plaintiff had the following severe impairments: "right knee pain with medial meniscus tear; right carpal tunnel syndrome (CTS); and morbid obesity." (*Id*.) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 11.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to perform light work "except she cannot stoop, crawl, climb, crouch or kneel more than occasionally, and she is precluded from constant grasping with the

right hand." (Tr. 12.) The ALJ also determined that these limitations would not meet the durational requirements of the Act because they "primarily resulted from her pregnancy." (Tr. 14.) At step four, the ALJ found that Plaintiff could return to her past relevant work as a teacher's aide. (Tr. 14.) Proceeding in the alternative, at step five the ALJ relied on VE testimony in response to his hypothetical, and found that work existed in significant numbers that Plaintiff could perform: cashier (5,000 in Flint, Michigan; 120,000 state-wide), fast food service (2,500 in Flint, Michigan; 90,000 state-wide) or hostess/greeter (300 in Flint, Michigan; 3,500 state-wide). (Tr. 15.) Accordingly, the ALJ found that Plaintiff was not under a disability, as defined by the Act, between July 27, 2007 and August 26, 2008. (*Id.*)

### E. Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (internal quotation marks omitted)). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip*

*v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

### F. Analysis

Plaintiff asserts that the "Commissioner erred as a matter of law by failing to properly evaluate the facts and medical evidence in accordance with SSR 96-8P." (Dkt. 7, Pl.'s Mot. Summ.

J. at 6.) Specifically, Plaintiff asserts that she was not capable of working 8 hours a day for 5 days a week. The Commissioner responds that the ALJ's ruling should be affirmed because Plaintiff's impairments did not meet the durational requirements of the Social Security Act. The Commissioner is correct. Since substantial evidence supports the ALJ's conclusion that Plaintiff was not under a disability for a period of 12 consecutive months, the ALJ's conclusion that Plaintiff is not disabled should be affirmed.

Under the Act, a "disability" requires an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or *which has lasted or can be expected to last for a continuous period of not less than 12 months*." 42 U.S.C. § 423(d)(1)(A) (emphasis added); *see also* 20 C.F.R. § 404.1509. Plaintiff's alleged period of disability ran from July 27, 2007 to August 26, 2008 — a period of 14 months. (Tr. 9.) Therefore, Plaintiff must have been disabled for all but two of those months in order to meet the Social Security Act's durational requirement. *See* 42 U.S.C. § 423(d)(1)(A). Substantial evidence in the record supports the ALJ's finding that Plaintiff's functional limitations did not last for a continuous period of at least 12 months.

First, the ALJ noted that Plaintiff admitted in a Disability Report that her work ended "not due to any impairment-related reason." (Tr. 14.) Indeed, Plaintiff candidly admitted that she stopped working in July 2007 because "the job funds run [sic] out." (Tr. 14, 142.) As such, substantial evidence supports the conclusion that Plaintiff was not prevented from engaging in "substantial gainful activity by reason of any medically determinable physical or mental impairment" on July 27, 2007, but rather because funding for her position ran out. (Tr. 14); 42 U.S.C. § 423(d)(1)(A).

Second, the medical evidence supporting Plaintiff's functional limitations first came from Plaintiff's treating physician – Dr. Walkerdine-Rogers – on September 14, 2007. (Tr. 14, 202.) These "limitations...vis-a-vis standing and walking" were the result of Plaintiff's pregnancy. (*Id*.) Plaintiff's pregnancy ended via a C-Section on February 15, 2008. (Tr. 239, 271.) Thus, the medical evidence supports a finding that Plaintiff's functional limitations lasted from September 14, 2007 through February 15, 2008 – a period of only five months.

Furthermore, an October 2007 note from Dr. Walkerdine-Rogers stated that Plaintiff "works at the elementary school taking care of kindergarten kids." (Tr. 200.) The same doctor gave Plaintiff work restrictions, stating that "she could do a sitting job and no walking and . . . standing." (Tr. 200.) The previous month, Plaintiff had been given a note stating that she needed "a job that requires no standing or walking for any length of time." (Tr. 202.) Additionally, as the ALJ noted, Plaintiff admitted in October 2007 to engaging in light housework from 1-4 hours per day, 2-3 days per week. (Tr. 14, 162.) All of this evidence supports the ALJ's conclusion that Plaintiff was not disabled through October 2007.

On February 26, 2008, eleven days postpartum, Plaintiff told Dr. Walkerdine-Rogers that "the knee pain [was] much better now since delivering." (Tr. 239.) Indeed, Dr. Walkerdine-Rogers did not list knee pain as one of Plaintiff's medical problems during that office visit. (Tr. 239.) There is some evidence that Plaintiff's knee pain worsened in March 2008, but there is no evidence that the "knee tenderness" in March 2008 prevented Plaintiff from engaging in "substantial gainful activity." (Tr. 239); 42 U.S.C. § 423(d)(1)(A). In addition, the record reveals that Plaintiff did not fully cooperate during the March 2008 exam. (Tr. 237.) Finally, Plaintiff was working again by August 26, 2008 – six months after she gave birth. (Tr. 30-31.)

In sum, substantial evidence (including Plaintiff's own statements and statements by Plaintiff's treating doctor) support the conclusion that Plaintiff could do at least some work through October 2007 – a finding which by itself means that Plaintiff failed to meet the 12-month durational requirement. The medical evidence also suggests Plaintiff's condition significantly improved after she gave birth in February 2008. As such, the undersigned recommends affirming the ALJ's holding that Plaintiff was not disabled.

### G. Conclusion

Based on the foregoing, it is **RECOMMENDED** that Plaintiff's motion for summary judgment be **DENIED**, that Defendant's motion for summary judgment be **GRANTED** and that the findings and conclusions of the Commissioner be **AFFIRMED**.

### III. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not

later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

                                               s/Mark A. Randon
                                               Mark A. Randon
                                               United States Magistrate Judge

Dated: December 6, 2011

*Certificate of Service*

*I hereby certify that a copy of the foregoing document was mailed to the parties of record on December 6, 2011, by electronic and/or ordinary mail.*

                                               *s/Barbara M. Radke*
                                               *Judicial Assistant*